CITY OF DAYTON, Appellee,

v.

**FRATERNAL ORDER OF POLICE, Appellant.**

[Cite as *Dayton v. Fraternal Order of Police* (1991), 76 Ohio App.3d 591.]

Court of Appeals of Ohio,
Montgomery County.

No. 12793.

Decided Dec. 10, 1991.

*J. Anthony Sawyer,* Director of Law, *Kenneth E. Barden,* Chief General Counsel, and *Susan S. Silberstein,* Chief Administrative Counsel, for appellee.

*Sorrell Logothetis* and *Susan D. Jansen,* for appellant.

GRADY, Judge.

The Fraternal Order of Police ("FOP") appeals from the judgment of the trial court vacating an arbitrator's award concerning payment of health insurance benefits by the city of Dayton for the benefit of the members of the FOP, who are employees of the city. The subject of the arbitration, health insurance coverage is provided in two separate labor agreements with identical terms concerning benefits. The matter submitted for arbitration was an increase in the amount of the maximum or "cap" amount payable by the city for premiums.

The contracts ran from May and September 1989 through May and September 1992. Each provides:

"HEALTH CARE COVERAGE RE-OPENER

"The health care coverage provisions of this Agreement shall remain in full force and effect until June 1, 1990. Not later than sixty (60) days prior to June 1, 1990, the parties shall re-open for negotiations those provisions of this Agreement relating to the health care coverage.

"In the event that the negotiations prior to June 1, 1990, do not result in mutual agreement between the parties on health care coverage for the insurance year June 1, 1991 through May 31, 1992, not later than sixty (60) days prior to June 1, 1991, the parties shall re-open for negotiations those provisions of this Agreement relating to the health care coverage.

"The re-opening of the Agreement for health care coverage negotiations shall invoke the dispute settlement procedures set forth in Chapter 4117.14 of the Ohio Revised Code."

The agreement to employ the dispute settlement procedures of R.C. 4117.14 was consistent with Section (E) of that statute, which provides that employees covered by the Public Employees' Collective Bargaining Act (R.C. Chapter 4117) may submit "issues in dispute" to a settlement procedure, including the "final offer settlement procedure" of R.C. 4117.14. In that event, however, the procedure must constitute final and binding resolution of the issues in dispute by a neutral third party. Ohio Adm.Code 4117–9–03(C).

The parties commenced negotiations on health care coverage provisions in April 1990. No mutual agreement was reached on the maximum or "cap" amount of the city's share of health insurance premiums or when the new coverage was to commence. The FOP proposed a commencement date of July 1, 1990. The city proposed a commencement date of July 1, 1990 or upon ratification by the FOP membership, whichever was later.

R.C. 4117.14(C)(3) provides that if there is no resolution of the negotiations, the matter is submitted to a fact finder, who "shall make final recommendations as to all the unresolved issues." After due consideration of the respective positions the fact finder recommended a specific, higher "cap" for the city's contribution and that "the effective date for the new rate of contribution under the medical insurance premium cap should be July 1, 1990." The city rejected the fact finder's proposal. The issues were next submitted to the final offer settlement procedure for binding arbitration.

The final offer settlement procedure of R.C. 4117.14 contains thirteen enumerated "guidelines" set out in Section (G) of the statute, which provides, *inter alia:*

"The following guidelines apply to final offer settlement proceedings under division (D)(1) of this section:

"(1) The parties shall submit to final offer settlement those issues that are subject to collective bargaining as provided by section 4117.08 of the Revised Code and *upon which the parties have not reached agreement* and other matters mutually agreed to by the public employer and the exclusive representative; except that the conciliator may attempt mediation at any time.

" * * *

"(11) *Increases in rates of compensation and other matters with cost implications awarded by the conciliator may be effective only at the start of the fiscal year next commencing after the date of the final offer settlement award;* provided that if a new fiscal year has commenced since the

issuance of the board order to submit to a final offer settlement procedure, the awarded increases may be retroactive to the commencement of the new fiscal year. The parties may, at any time, amend or modify a conciliator's award or order by mutual agreement." (Emphasis added.)

The parties proposed different caps and commencement dates to the "conciliator," who acted as arbitrator. The FOP proposed a commencement date of July 1, 1990.[1] The city proposed, for the first time, a commencement date of January 1, 1991, the beginning of the next fiscal year.

After a hearing and consideration of the evidence, the arbitrator on September 30, 1990, determined that new, higher "caps" for the city's share of premiums would be $116.90 per month for a single employee and $310.60 for family coverage.

The arbitrator also determined that the effective date for the new cap should be July 1, 1990, rather than January 1, 1991, when the city's fiscal year next commenced. The arbitrator acknowledged that the "cap" determination is a matter " 'with cost implications awarded by the Conciliator' and as such, the provisions of O.R.C. 4117.14(G)(11) apply." The arbitrator found, however, that the parties intended to *waive* the "fiscal year" commencement requirement and commence renegotiated changes on July 1, 1990, by virtue of the reopener provision adopting that date for the termination of prior coverage. The report cited "past practice" in which premium contributions commenced at the beginning of the new plan year, on July 1. The arbitrator also noted that the city had not asserted a January 1 commencement date prior to the recommendation of the fact finder, and that "it is simply illogical, harsh, and inconceivable, that the parties would contemplate commencing negotiations for an annual health care benefit in June, yet have the improvement, if any (or diminution) not go into effect until January, some six months later, and at a time when ½ of the improvement (or diminution) benefit negotiated would be lost to the bargaining units, or the City, as the case may be." (Report and Recommendation, at 41.)

The city appealed the arbitrator's Report and Award to the common pleas court pursuant to R.C. 2711.10(D), alleging that it is contrary to law and requested, pursuant to R.C. 2711.13, that the order be vacated. The trial court found that any implied intention to adopt July 1, 1990 as a commencement date could not supersede the express intent of the statute and contract to reserve the statutory protections and procedures of R.C. 4117.14(G)(11), limiting commencement of benefits having a cost implication to become

---

1. The coverage was extended by the city from the "reopener" date of June 1, for an additional thirty days, until July 1.

"effective only at the start of the fiscal year next commencing." On that basis the trial court vacated the conciliator's report in its entirety.

Dayton has, according to its interpretation of the agreement, commenced new insurance plan coverage on July 1, 1990. That new coverage has produced a higher premium cost. Because the arbitrator's award was vacated in its entirety, the city's higher share of the premium cost through new "caps" did not become effective until January 1, 1991. The difference was paid, or payable, by each employee for the six months between July 1, 1990 and January 1, 1991, in an amount determined according to the plan to which the employee subscribed.

The FOP has timely appealed the decision of the trial court and presents two assignments of error:

"The lower court applied an improper standard of review to the conciliator's report and award.

"The lower court erred in reviewing and vacating the conciliator's report and award."

Because these assigned errors turn on the same issues of fact and law, they will be considered together.

This matter was brought to the common pleas court on the allegation that the arbitrator "exceeded his power" so that "a mutual, final, and definite award upon the subject matter submitted was not made." R.C. 2711.10(D).

■ Given the presumed validity of an arbitrator's award, a reviewing court's inquiry into whether he exceeded his authority is limited, and once it is determined that the arbitrator's award draws its essence from the collective bargaining agreement and is not unlawful, arbitrary, or capricious, a reviewing court's inquiry under R.C. 2711.10(D) is concluded. *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.* (1990), 49 Ohio St.3d 129, 551 N.E.2d 186.

"When a provision in a collective bargaining agreement is subject to more than one reasonable interpretation and the parties to the contract have agreed to submit their contract interpretation disputes to final and binding arbitration, the arbitrator's interpretation of the contract, and not the interpretation of a reviewing court, governs the rights of the parties thereto." *Hillsboro v. Fraternal Order of Police* (1990), 52 Ohio St.3d 174, 556 N.E.2d 1186, syllabus by the court.

"Hence, judicial inquiry for purposes of vacating an arbitrator's award is limited by *Findlay,* and where a reviewing court exceeds the permissible scope of review such judgment will be reversed." *Id.* at 176, 556 N.E.2d at 1189.

■ Our review of this matter is confined to an evaluation of the order issued by the court of common pleas pursuant to R.C. 2711.10. We also may not pass on the substantive merits of the arbitration award absent evidence of material mistake or extensive impropriety. *Lynch v. Halcomb* (1984), 16 Ohio App.3d 223, 16 OBR 238, 475 N.E.2d 181.

The interpretation of the contract adopted by the court of common pleas is a reasonable interpretation. In a matter litigated directly and in the first instance in that court, and where our standard of review is the "manifest weight of the evidence," we would readily affirm. However, the common pleas court is not the first determinator of the issues. It may reverse the first determination, that of the arbitrator, only if it finds that the determination fails under the standards of R.C. 2711.10. Where the common pleas court exceeds the permissible scope of that inquiry, we must reverse.

■ The role of an arbitrator is unique. When the words of an agreement are plain and clear, conveying a distinct idea, there is no occasion to obtain an outside interpretation of what they convey. But, when plausible contentions can be made for conflicting interpretations, the agreement becomes ambiguous. In that case the function of an arbitrator is to determine and carry out the mutual intent of the parties by interpreting the agreement and applying its provisions to the issues before him or her. The "primary rule in construing a written instrument is to determine, not alone from a single work or phrase, but from the instrument as a whole, the true intent of the parties and to interpret the meaning of a questioned word or part with regard to the connection in which it is used, the subject matter and its relation to all the other parts or provisions." Elkouri, How Arbitration Works (4 Ed.1985), at 352–353.

■ The function of an agreement to arbitrate is also unique. While its operation is prospective, the agreement to arbitrate and to be bound by the award is part of what the parties bargained for. It is an extension of their agreement. It should not be set aside unless the arbitrator clearly acted outside his or her charge.

■ A further aspect of this case that cannot be ignored is its genesis in Ohio's 1983 Public Employees' Collective Bargaining Act, R.C. Chapter 4117. The purpose of that Act is to protect the public interest in prohibiting strikes by public employees whose uninterrupted service is necessary to maintain public safety, while achieving equity in the resolution of labor-management disputes between those employees and their public employers. That purpose distinguishes arbitration of those disputes from arbitration of private disputes in a regular commercial setting.

■ The "final offer settlement proceedings" of R.C. 4117.14 to which these parties have agreed to be bound have the force of statutory law. However, when incorporated into a contract they lose that force and become but one element of the agreement. In determining the mutual intent of the parties concerning any ambiguity the arbitrator may look to the entire agreement, the history of the dealings between the parties, and industry practice.

The trial court held that the arbitrator was not authorized, by reason of the limitation in R.C. 4117.14(G)(11), to find or order a commencement date for new "caps" earlier than the beginning of the city's next fiscal year on January 1, 1991. Certainly, that limitation is in the statute and has been incorporated into the agreement. However, it applies to issues in dispute submitted for arbitration. If the parties did not intend to include the commencement date in the "reopener" clause as a matter for renegotiation, it is not an issue in dispute. In that event, R.C. 4117.14(G)(11) notwithstanding, it is not a matter subject to arbitration or the limitations of the statute concerning the arbitrator's award.

■ The issues in dispute and submitted for arbitration were those concerned in "reopening the agreement for health care coverage negotiations." The arbitrator found that the parties did not mutually intend to reopen for negotiations the date on which the employer's new contribution would commence. If the arbitrator's interpretation of the provision in this respect is "reasonable" it must be affirmed, notwithstanding that a contrary reasonable interpretation is possible. *Hillsboro, supra.*

The contracts provided that the city would provide health care coverage as a benefit of employment to FOP lodge members during the term of the contracts, which was for three years beginning in 1989. However, each contract also provides:

"The health care coverage provisions of this Agreement shall remain in full force and effect until June 1, 1990. Not later than sixty (60) days prior to June 1, 1990, the parties shall re-open for negotiations those provisions of this Agreement relating to the health care coverage."

This "reopener" provision is unclear concerning the issues to be renegotiated. It may mean the entire benefit. It may mean only certain coverages and costs. Different interpretations are possible. Thus, an ambiguity is created, and the parties had agreed to submit such issues to an arbitrator, who would resolve the ambiguity by determining the mutual intention of the parties through application of settled principles of interpretation.

In resolving the ambiguity the arbitrator found that when they made their agreement the parties did not intend the commencement date for new "caps" to be matter for renegotiation. He based his finding on a conclusion that the parties mutually intended that the new caps should coincide with any benefit and premium changes that commence with the new insurance year on July 1, 1990. That conclusion was founded on past practice and a reading of the agreement as a whole. It was a reasonable interpretation of the provision, albeit not the *only* reasonable interpretation.

We find the arbitrator's interpretation was reasonable upon the following analysis.

First, the stated "Purpose" of the agreements between Dayton and the FOP is to fulfill the mutual obligations of those parties. Article 16, Section I of each contact provides that each employee may choose an optional coverage plan "provided by the City of Dayton during the term of this contract." Each contract is for a three-year term. Therefore, the contracts evidence a mutual intention that throughout each three-year period the city will provide health care coverage to appellant's members.

Second, the July 1 date has significance in that it is, and in past years has been, the beginning of a new "insurance year." A new insurance plan usually provides for different coverages and costs. According to past practice and custom, new coverages and costs have commenced together. It is reasonable to conclude, as the arbitrator did, that the parties mutually intended that commencement of the new "cap," which is a function of premiums, coincide with commencement of the new premiums for the new "insurance year."

Third, the issue to be determined does not concern a matter of "management rights" but, instead, an employee benefit. "[A]rbitrators have often ruled custom to be binding where it involved a 'benefit' of peculiar personal value to the employees." Elkouri, *supra*, at 444. The city's new "cap" obligation, which affects an employee's share of premiums, is certainly a benefit of peculiar personal value. The courts have ordinarily given substantial deference to the decisions of arbitrators on such issues.

Fourth, it would not serve the purposes of the Public Employees' Collective Bargaining Act to allow a requirement adopted only by reference and not the subject of specific and definite agreement, R.C. 4117.14(G), to shift temporarily to employees a cost chargeable otherwise to the employer. The objective of equity in the resolution of labor-management disputes is not served by such a result, which the arbitrator properly found to be illogical and harsh.

Because the arbitrator found that the parties had mutually agreed that the new caps would commence with the new insurance year, the proper date for commencement was not an "issue in dispute" to be resolved by arbitration.

Therefore, though it had "cost implications," it was not subject to the R.C. 4117.14(G)(11) limitation applicable to arbitrator's awards. The arbitrator did not, therefore, exceed his powers within the meaning of R.C. 2711.10(D), as alleged by appellee in its complaint, in ordering commencement of new benefits on July 1, 1990, a date on which the parties had mutually agreed.

For the foregoing reasons we conclude that the decision of the arbitrator was reasonable and that it drew its essence from the agreement of the parties. It was not unlawful, arbitrary, or capricious. It represented a proper interpretation of the whole agreement and application of its principles. Its findings and conclusions were part of what the parties bargained for in agreeing to arbitrate. Therefore, the trial court erred in reversing the award.

Appellant's two assignments of error are sustained. The judgment of the trial court will be reversed and the award of the arbitrator is ordered reinstated.

*Judgment reversed.*

WILSON, J., concurs.

WOLFF, J., dissents.

WOLFF, Judge, dissenting.

I respectfully dissent. I do not think that the parties' agreement can be reasonably interpreted as not including the operation of R.C. 4117.14(G)(11) upon the conciliator's award where the parties have agreed to resort to the "dispute settlement procedures set forth in [R.C.] 4117.14" (Agreement, Section 6, Article XVI), and the award results from their having done so. I would thus affirm the trial court, which vacated the conciliator's award as being in excess of his authority. R.C. 2711.10(D).